1   QUYEN L. TA (SBN 229956)          MCGREGOR W. SCOTT (SBN 142413)
    qta@kslaw.com                     mscott@kslaw.com
2   **KING & SPALDING LLP**           **KING & SPALDING LLP**
    50 California Street, Suite 3300   621 Capitol Mall, Suite 1500
3   San Francisco, CA 94111           Sacramento, CA  95814
    Telephone:   +1 415 318 1214      Telephone:    +1 916 321 4814
4   Facsimile:   +1 415 318 1300

5   K. LUAN TRAN (SBN 193808)
    ltran@kslaw.com
6   MICHAEL D. ROTH (SBN 217464)
    mroth@kslaw.com
7   JAMES A. UNGER (SBN 325115)
    junger@kslaw.com
8   **KING & SPALDING LLP**
    633 West Fifth Street, Suite 1600
9   Los Angeles, CA 90071
    Telephone:   +1 213 443 4355
10  Facsimile:   +1 213 443 4310

11  *Attorneys for Plaintiff, Anh Lê*

12

13                    IN THE UNITED STATES DISTRICT COURT

14               FOR THE NORTHERN DISTRICT OF CALIFORNIA

15                         SAN FRANCISCO DIVISION

16

17  **ANH LÊ**,                              Case No. 3:22-cv-477

18              Plaintiff,                    **COMPLAINT FOR DECLARATORY
                                              AND INJUNCTIVE RELIEF**
19        v.

20  **CHESA BOUDIN**, in his official capacity as
21  District Attorney of the City and County of San
    Francisco, California; **CITY AND COUNTY
22  OF SAN FRANCISCO**,

23              Defendants.

24

25

26

27

28

**PRELIMINARY STATEMENT**

1.      This case is about the systematic refusal of the San Francisco District Attorney's Office to uphold the fundamental rights of Asian American victims of racially-motivated violence, and thereby to recognize their humanity and treat them with the respect and dignity to which all human beings are entitled.

**INTRODUCTION**

2.      On November 2, 2019, while out for an afternoon walk in San Francisco's Chinatown, Plaintiff Anh Lê, now a 69-year-old Vietnamese man, was brutally attacked by Jimmy Tanner ("Tanner") and his teenage son.  Without provocation, Tanner attacked Mr. Lê on a crowded sidewalk, threatened him with a glass bottle, and told him, "I'm going to kill you!" While Tanner was attacking Mr. Lê, Tanner's son struck Mr. Lê repeatedly with a baseball bat. Unfortunately, the beating of Mr. Lê was not an isolated incident.  Indeed, as Mr. Lê later learned, the attack on him was only one of three incidents in Chinatown that day where Tanner and his family terrorized Americans of Asian descent.  To compound the tragedy of this brutal attack, when Mr. Lê reported the incident and sought help from the San Francisco District Attorney's Office ("DA's office"), he was ignored, made to feel invisible, and denied his constitutional right to be consulted by the DA's office before it finalized a very lenient plea deal with Tanner.  Mr. Lê also never had the chance to give his victim impact statement to the court before Tanner received a sentence that did not reflect the severity of his hate crime.  Mr. Lê brings this suit for himself, but also to recognize and to restore the dignity of all Asian American hate crime victims who have been assaulted, attacked, and killed in the recent anti-Asian crime wave, and who the DA's office has failed to treat with dignity and humanity.

3.      The November 2 racially-motivated attacks on Mr. Lê and the other victims are themselves only a few of the surging number of episodes of violence committed against Asian Americans in San Francisco and the United States.  As of August 2021, the Associated Press reported[1] that more than 9,000 anti-Asian incidents have been documented in the United States

---

[1] Terry Tang, *More than 9,000 Anti-Asian incidents Since Pandemic Began*, ASSOCIATED PRESS, (August 12, 2021), available at: [https://apnews.com/article/lifestyle-joe-biden-health-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

since the COVID-19 pandemic began.  "Many of the headline-making attacks over the past year and a half have been against elderly Asian people on both coasts.  In most of those cases, a senior was beaten, kicked, shoved or even stabbed out of nowhere."  *Id.*  The fear of such attacks has caused many elderly Asian Americans to be stuck in their homes, missing exercise, time with family, and even doctor's appointments.  *Id.*  According to FBI statistics, the ongoing rise in hate crimes against Asian Americans[2] included a 73% increase in reported incidents from 2019 to 2020.[3]

4.     San Francisco has been an epicenter of these incidents:

> Two grandmothers stabbed and a third punched in the face in broad daylight.  An 84-year-old man fatally shoved to the ground while on his morning walk.  In the past seven months, at least seven older Asian residents have been brutally attacked in San Francisco, a city with one of the largest Asian American populations and the oldest Chinatown in the country.

Thomas Fuller, *Fear, and Discord, Among Asian Americans Over Attacks in San Francisco*, N.Y. Times, (July 18, 2021, updated Oct. 15, 2021), available at: [https://www.nytimes.com/2021/07/18/us/asian-attacks-san-francisco.html].

5.     This surging wave of hate and violence is itself only the latest chapter in a history of violence against Asian Americans in the United States and in California and San Francisco in particular.  Tragically, this history of violence is also marked by repeated failures of the State's legal system to protect Asian Americans against such violence.

6.     In this case, as disturbing as the attack on Mr. Lê is, equally disturbing is his mistreatment by the DA's office in the aftermath of his violent attack by the Tanner family.

7.     The DA's office never informed Mr. Lê of plea-bargaining discussions it had with Jimmy Tanner, and it never gave Mr. Lê the proper opportunity to comment on these discussions

---

coronavirus-pandemic-race-and-ethnicity-d3a63408021a247ba764d40355ecbe2a].

[2] *See* Weiyi Cai et al., *Swelling Anti-Asian Violence: Who Is Being Attacked Where*, N.Y. Times, (April 3, 2021), available at: [https://www.nytimes.com/interactive/2021/04/03/us/anti-asian-attacks.html].

[3] *See Criminal Justice Information Services: Hate Crime Statistics*, https://www.fbi.gov/services/cjis/ucr/hate-crime (last visited Nov. 1, 2021).

in court, to attend hearings, or to read his victim impact statement, before the DA's office agreed to a slap-on-the-wrist plea agreement, which required no jail time and only one year of probation for Mr. Tanner.  The DA's office only told Mr. Lê about this lenient plea deal—and the failure to charge Mr. Tanner with a hate crime—after the fact via a cursory email.  This despite Mr. Lê's repeated requests, including emails sent to the DA's office on September 1, 2020, to be informed about the disposition of the case including the charges against the Tanners, and his insistence that the court be made aware of his desire that Mr. Tanner "be held fully accountable to the fullest extent of the law."

8.      The DA's office's cavalier and callous treatment of Mr. Lê is further illustrated by its repeated refusal to correct the erroneous and potentially ineffective criminal protective order ("CPO") that it initially obtained as part of Jimmy Tanner's plea.  In that initial CPO stating that Jimmy Tanner was to stay away from his victims (Mr. Lê and the other Asian Americans who were attacked by Mr. Tanner and his family), the DA's office even failed to refer to Mr. Lê by his correct full name and misstated his age, thus raising doubts about the enforceability of the CPO.

9.      Before he was able to retain counsel, Mr. Lê spent many months trying to get the DA's office to aid him in the simple task of correcting the CPO to ensure his safety.  Unfortunately, Mr. Lê was ignored, pushed aside, and shuffled around like one of the DA's office's many files.  Instead of treating Mr. Lê as an individual and a citizen who had suffered a brutal racially-motivated attack, the DA's office made Mr. Lê feel invisible.  Even after Mr. Lê retained pro bono counsel, the DA's office continued to drag its feet, refused to obtain the corrected CPO, and forced Mr. Lê and his pro bono counsel to make multiple requests and attend multiple court hearings to correct what should have been a minor ministerial issue easily corrected by the DA's office long ago.  The DA's office even (incorrectly) told Mr. Lê and his counsel that he had no right to be heard at hearings.  Tellingly, the judges presiding over those hearings disagreed and were troubled by what they heard from Mr. Lê, with judges of the criminal division of the San Francisco Superior Court telling Mr. Lê that the DA's office had evidently violated his rights as a victim, thanking him for his courage in speaking out, and

apologizing for the system's failures in his case.

10.     The DA's office's failures detailed by Mr. Lê are a clear violation of Marsy's Law, approved by California voters as Proposition 9, the Victims' Bill of Rights Act of 2008, and enshrined in the California Constitution, article I, § 28(b).  This measure is known as Marsy's Law after a young woman who was murdered in 1983.  Following the arrest of Marsy's murderer, Marsy's mother was shocked to meet the man accused of killing her daughter at a local supermarket after he was released on bail without Marsy's family receiving notice or an opportunity to express opposition to his release.

11.     One of the principal purposes of Marsy's Law is to provide victims "due process" by affording them an opportunity to be heard in proceedings concerning the prosecution, punishment, and release of those who victimized them.  As the California Supreme Court explained:

> [There is an] important *due process interest* in recognizing the dignity and worth of the individual by treating him as an equal, fully participating and responsible member of society.  For government to dispose of a person's significant interests without offering him a chance to be heard is to risk treating him as a nonperson, an object, rather than a respected, participating citizen.

*In re Vicks*, 56 Cal. 4th 274, 310 (2013) (cleaned up and emphasis added) (quoting *People v. Ramirez*, 25 Cal. 3d 260, 264 (1979)).  These basic procedural protections "express a collective judgment that human beings are important in their own right, and that they must be treated with understanding, respect, and even compassion."  *Id.*

12.     Mr. Lê was denied this respect and his enumerated rights under Marsy's Law were systematically violated, including:

| Constitutional Right | Mr. Lê's case |
|---|---|
| Right to be reasonably protected from the defendant and persons acting on behalf of the defendant. | Erroneous, possibly ineffective protective order issued, which the DA's office refused to correct. |
| Right to reasonable notice of and to reasonably confer with the prosecuting agency, upon request, regarding the arrest of the defendant if known by the prosecutor, the charges filed and, upon | Objections to limited charges ignored. Not informed of lenient plea deal until after it was completed despite requests to be kept informed. |

| | |
|---|---|
| request, to be notified of and informed before any pretrial disposition of the case. | |
| Right to reasonable notice of all public proceedings at which the defendant and the prosecutor are entitled to be present and to be present at all such proceedings. | Not informed that he had a right to attend hearing where lenient plea deal was presented and accepted. |
| Right to be treated with fairness and respect for his or her privacy and dignity. | Communications ignored.  Told he could not speak in Court.  Concerns dismissed. |

Cal. Const. art. I, § 28(b).

13.     The violations of Mr. Lê's rights were later recognized by the Honorable Judge Teresa Caffese, who told Mr. Lê:  ***The DA's office should have notified you because that's the law.  That's Marsy's Law.***"  Ex. A at 5:16-17 (emphasis added).  Further, when Mr. Lê stated that he believed that the specific failure by the DA's office to "let him know they were considering a plea agreement . . . is a violation of Marsy's Law," the Court responded: "[y]ou're right about that."  *Id.* at 12:12-24.

14.     Further, nobody in the Tanner family was charged with a hate crime.  Of course, not every violent crime against a member of Asian American community is a hate crime, but here the Tanners' violent unprovoked attacks on *multiple groups of Asian Americans in Chinatown on the same day* were evidently racially motivated.  While prosecutors must charge according to proof, Americans of Asian descent are entitled to the full protection of the law and to equal enforcement of the law when it comes to acts of violence against people of Asian descent.

15.     In sum, despite claiming on its website that "the San Francisco District Attorney's Office works to empower survivors of crime,"[4] in reality, the DA's office has not only failed to empower or protect Mr. Lê, but actually exacerbated and further compounded the trauma and indignities he suffered at the hands of the Tanners.

16.     Mr. Lê brings this Complaint for injunctive and declaratory relief because he understands that neither the unprovoked attack on him in Chinatown nor his mistreatment by the

---

[4] https://www.sfdistrictattorney.org/about-us/.

San Francisco DA's office are unique.  Rather, in the face of an alarming wave of attacks on Asian Americans, the DA's office has systematically failed to enforce California's laws to protect the Asian American community and failed to uphold the basic due process rights of victims of such targeted violence.  Many of these victims are immigrants with limited education, ability to communicate in English, and understanding of the criminal justice system.  Without proper training and protocols, the DA's office's current practice of responding to these attacks and interacting with Asian American victims is so flawed that it has deprived, and continues to deprive, Mr. Lê and other Asian Americans of the equal protection of the law, due process, and the rights, privileges, and immunities secured and protected by the United States Constitution.

17.     Calls by Asian American organizations and lawyers to reform these practices have so far gone unheeded, and the DA's office's empty promises fail to recognize and restore the dignity of Asian American victims of hate crimes.  To guarantee equal protection of the laws to Asian American residents of San Francisco, to afford Asian American residents the due process rights they are guaranteed under the United States Constitution, and to ensure that if he is attacked again his constitutional rights will be observed, Mr. Lê respectfully requests, among other things, that this Court require the San Francisco District Attorney's Office to institute basic training and protocols and provide humane support and assistance to Asian American victims of violence in the aftermath of attacks, during criminal prosecution, at and after sentencing.

## THE PARTIES

18.     Plaintiff Anh Lê is a 69-year-old Vietnamese American man and a longtime resident of the City and County of San Francisco, a journalist, a father, and a citizen of the United States of America.

19.     Defendant Chesa Boudin is the elected District Attorney of the City and County of San Francisco.  The declaratory and injunctive relief requested in this action is also sought against Defendant Boudin's officers, employees, and agents, and against all persons acting in active concert or participation with any Defendant, or under any Defendant's supervision, direction, or control.

20.     Defendants City and County of San Francisco are municipal corporations located

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

in the Northern District of California.  The City and County of San Francisco fund and operate the San Francisco District Attorney's Office, the governmental agency responsible for prosecuting public offenses within their jurisdiction.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over the claims in this Complaint per 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), and 42 U.S.C. §§ 1981, 1983, and 1988.

22.      Plaintiff seeks declaratory and injunctive relief pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202, which grant this Court authority to declare the rights and legal relations surrounding questions of actual controversy that exist between Plaintiff and Defendants.

23.     This action arises under the United States Constitution, as applied to state and/or local authorities through 42 U.S.C. § 1983.

24.     Under *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny, this Court has authority to enjoin Defendant Chesa Boudin in his official capacity from violating federal law, but only if he is named as a defendant.

25.      Venue is proper within the Northern District of California pursuant to 28 U.S.C. § 1391, because Mr. Boudin and the San Francisco District Attorney's Office reside within this judicial district and a substantial part of the events and omissions giving rise to this lawsuit occurred in this judicial district.

## FACTUAL ALLEGATIONS

**A.   ANH LÊ, A VIETNAMESE AMERICAN SENIOR CITIZEN, IS ATTACKED WITHOUT PROVOCATION, WITH A BAT AND BOTTLE, IN BROAD DAYLIGHT ON THE STREETS OF SAN FRANCISCO'S CHINATOWN.**

26.     On November 2, 2019, Plaintiff Anh Lê, a then-67-year-old Vietnamese American and longtime resident of San Francisco, was out for an afternoon walk in Chinatown when he was suddenly and violently attacked by Jimmy Tanner and his teenage son.

27.     As Mr. Lê walked in front of a Chinese grocery store located at 1118 Stockton

7

Street, Tanner's son rode his bicycle very quickly on the crowded sidewalk towards Mr. Lê.

28.    Seeing Tanner's son almost hit multiple pedestrians including himself, Mr. Lê politely urged Tanner's son, "you have to be careful, there's people all over."

29.    In response, Tanner's son stopped his bike, turned around, and said "you want me to pull out my bat from my bag and hit you?"  He repeated this threat several times.

30.    Tanner's son then retrieved a baseball bat from his mother, who was standing on the sidewalk nearby.

31.    Tanner's son then raised the bat with both arms and struck Mr. Lê repeatedly before a horrified crowd of onlookers.

32.    During the attack, Mr. Lê was forced to use his arms to protect himself, absorbing numerous blows, and he also was repeatedly struck in the thigh.

33.    Jimmy Tanner then joined in the attack, rushing towards Mr. Lê and raising a glass Snapple bottle and shouting at him repeatedly:  "I'm going to hit you with this bottle" and "I'm going to kill you!"

34.    Jimmy Tanner and Tanner's son pursued Mr. Lê for approximately half a block, while he stumbled and attempted to protect himself from the attacks, until he was finally able to cross the street to dial 9-1-1.

**B.    MR. LÊ'S ASSAILANTS ATTACK TWO OTHER GROUPS OF ASIAN AMERICANS IN CHINATOWN THAT SAME DAY.**

35.    On information and belief, this attack was only one of three incidents in Chinatown that day, where the Tanner family terrorized Americans of Asian descent.  Based on this behavior, Plaintiff is informed and believes that these attacks were motivated by animus based on race and/or national origin.

36.    Regarding these other incidents, all of the following is stated on information and belief and consistent with the Incident Report issued by the San Francisco Police Department, as well as with the Criminal Protective Order, which lists the names of several Asian American individuals.

37.    One of the other two attacks occurred earlier that day at the S&M Ginseng Inc.

8

and Chinese Herbal Store ("S&M Ginseng") at 1000 Stockton Street, a few blocks from where Mr. Lê was attacked.  This attack was captured by surveillance footage recovered by the San Francisco Police Department.

38.     During the incident at S&M Ginseng, both Jimmy Tanner and Tanner's son threatened the store owner and customers.  Jimmy Tanner also pushed a glass bottle against the nose of the owner of S&M Ginseng.  Additionally, without provocation, Tanner's son hit one of the customers at S&M Ginseng with a baseball bat.

39.     The third attack occurred at the intersection of Broadway and Stockton streets in Chinatown.  During that attack, Tanner's son rode his bicycle on the sidewalk towards a woman of Asian descent, began cursing at her, and then tried to hit her with what she believed at the time was an umbrella, but likely was the same black baseball bat used in the other attacks.

40.     Two officers of the San Francisco Police Department responded to a report of a battery at this location.  These officers, who had earlier taken Mr. Lê's statement, and who had spoken to the owner of S&M Ginseng and viewed the store's surveillance footage, detained the Tanner family, who they recognized from the surveillance footage.

41.     The officers recovered a black baseball bat with grey stripes from Tanner's son, which the officers noted matched the S&M Ginseng surveillance footage and Mr. Lê's description.  The officers then brought Mr. Lê to a nearby location in Chinatown and he identified Jimmy Tanner and Tanner's wife and son as his attackers.

42.     Jimmy Tanner was arrested and charged with Felony Elder Abuse, Felony Terroristic Threats, and Battery.  He was never charged with committing a hate crime.[5]

---

[5] California's hate crime laws are codified in California Penal Code sections 422.55, 422.6, 422.7, and 422.75.  These statutes make it an independent criminal offense for a person to commit a hate crime, and also impose enhanced penalties when a person commits an offense while motivated by a bias toward the victim because of the victim's race.  Astonishingly, despite Mr. Lê's attackers also having attacked other Asian Americans in two separate incidents on the same day, these laws were never applied by the DA's office.  Mr. Lê was not provided with an explanation as to why no such charges were filed, nor was he informed of any investigation into such charges.

9

### C. MR. LÊ'S PAIN AND HUMILIATION IS COMPOUNDED BY THE INSTITUTIONAL BETRAYAL[6] OF THE SAN FRANCISCO DISTRICT ATTORNEY'S OFFICE.

43.     In the days and many months after the Tanner family were arrested, Mr. Lê was relieved that his attackers had been taken into custody but he was also tormented by memories of the attack and fears of being attacked again.  He sought help from the DA's office, but he was repeatedly ignored and mistreated.

44.     Mr. Lê repeatedly communicated to the DA's office that he feared his attackers and wanted them kept away from himself and his family.  He also told the DA's office that he believed the Tanner family had attacked him because he was Asian American and that they should be charged with hate crimes.

45.     In response to Mr. Lê's numerous email messages expressing concerns and inquiring about the status of the case, on some occasions in 2020 and 2021, Mr. Lê received emails from Priscilla Portillo—his assigned "Victim's Advocate" in the DA's office—informing him of upcoming court dates in the case.

46.     However, those emails contained no explanation of what was to occur at the scheduled court dates (which were often rescheduled), and each time stated, "you are not required to attend," or the like.  On many occasions, Mr. Lê's emails were left unanswered.

47.     On March 21, 2021, after Ms. Portillo emailed Mr. Lê asking if he would be willing to testify at an upcoming hearing, Mr. Lê responded by describing the attack in detail and arguing that the defendant, Jimmy Tanner, should be charged with hate crimes.

48.     Ms. Portillo then further emailed Mr. Lê stating there would be an upcoming preliminary hearing but failed to notify Mr. Lê that the case might be resolved at that hearing, or that any plea deal was on the table.  Nor did the Assistant District Attorney ("ADA") assigned to

---

[6] Institutional betrayal is a phenomenon documented by psychologist Jennifer Freyd and others, whose studies indicate that victims of crime who subsequently experience a failure of institutions to protect them and hold their attackers accountable often suffer a more severe traumatic response and prolonged psychological harm.  *See* Jennifer Freyd and Pamela Birrell, *Blind to Betrayal: Why we fool ourselves we aren't being fooled*, (John Wiley & Sons, 2013), ISBN 978-0-470-60440-3.

the matter, Diego Lopez, communicate with Mr. Lê and provide him with the appropriate information regarding any sentencing or plea deal made with Jimmy Tanner.  At no point did ADA Lopez or the Ms. Portillo adequately explain to Mr. Lê that he had the right to submit and to read a victim impact statement in court.

49.     Not until after the plea deal was entered did ADA Lopez write to Mr. Lê and disclose the lenient deal he had made with Jimmy Tanner:

> Good afternoon Mr. Lê,
> Yesterday, April 12, 2021 the Defendant Jimmy Tanner pled to a misdemeanor 242 Battery charge for one year of probation, victim restitution, a criminal protective order valid for one year, fines and fees.
> Additionally, I expressed to the court all of your concerns outlined in your previous emails prior to Defendant pleading to the charge.
> We will send you a copy of the Criminal Protective Order.

50.     Mr. Lê was already extremely upset that he had not been given the opportunity to be heard before the DA's office had made the plea deal with Jimmy Tanner and the court accepted Mr. Tanner's plea.  Upon receiving the Criminal Protective Order ("CPO") from the DA's office, Mr. Lê grew even more upset when he saw multiple names—including names he did not recognize—as protected persons.  The CPO did not include his correctly spelled full name or his correct age.

51.     Mr. Lê was so confused by the errors in the CPO that he initially believed it pertained to a different case.

52.     Mr. Lê then repeatedly wrote to other officials in the DA's office, noting that he was never contacted about a potential resolution of Jimmy Tanner's case and requesting a CPO containing his correct name.

53.     The DA's office refused to assist Mr. Lê in obtaining a corrected protective order and did not offer any other remedy to the situation.  Instead, they continued to ignore him.

54.     On information and belief, in addition to Mr. Tanner's lenient plea, neither Tanner's son nor Tanner's wife served any jail time related to the attack on Mr. Lê or the other attacks that occurred on November 2, 2019.

55.     In April 2021, with the DA's office refusing to protect him and having let his attackers off with a proverbial "slap on the wrist," Mr. Lê became increasingly angry and depressed.  Having been cast aside by the DA's office, and fearful for his life, he became isolated and did not go outside or take walks in the city as he had before the attack.  Left with no other recourse, he then began to conduct research on the internet and came across an article announcing the creation of the Alliance for Asian American Justice ("The Alliance")[7], a national pro bono initiative comprised of hundreds of Asian American law firm partners and in-house counsel committed to standing up for Asian American victims and preventing future acts of anti-Asian hate.

56.     Mr. Lê then contacted Wilson Chu, a Partner in the law firm of McDermott Will & Emery LLP, a co-founder and member of The Alliance's board, and a name that was mentioned in the news article.  Mr. Chu referred Mr. Lê to the undersigned, Quyen Ta and K. Luan Tran, Vietnamese American law firm partners and members of The Alliance.  Upon hearing Mr. Lê's story, Ms. Ta and Mr. Tran agreed to serve as counsel for Mr. Lê, along with their colleagues at King & Spalding LLP.

57.     On July 28, 2021, Mr. Lê and Ms. Ta attended a conference in the criminal case against Jimmy Tanner ("July 28 Conference").  A true and correct copy of the transcript of the July 28 Conference is attached here as **Exhibit A**.

58.     ADA Greg Flores, representing the DA's office that day, told Ms. Ta and Mr. Lê that they were not permitted to speak.  However, Ms. Ta persisted.  She, the ADA, and the Deputy Public Defender then approached the bench and Ms. Ta asked that her client be able to read from his victim impact statement, which he was not given the opportunity to read at Jimmy Tanner's sentencing.  The Court invited Mr. Lê to the podium and told him to take as much time as he needed.

---

[7] *See* https://www.allianceaajustice.org/.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

59.     After describing the attack, Mr. Lê read from his victim impact statement,

attached here as **Exhibit B**, which reads in part:

> Mr. Tanner took away my dignity and sense of safety, and as I
> described above, the DA's office has taken away my hope for
> justice and allowed a violent criminal, Jimmy Tanner, Sr., and his
> adolescent son, to roam the street looking for more victims and
> preying on elderly Asian Americans to attack and assault.
>
> Ever since November 2019, I cannot help but picture the attack
> over and over again.  I no longer feel safe walking the streets of
> our city, as I used to love to do.  I look over my shoulder and
> wonder if there are people who want to hurt me because I am
> Asian American.  I simply no longer feel safe or welcome in this
> city I have loved for so many years.  Knowing that the attack was
> never acknowledged as a hate crime, and that Mr. Tanner and his
> son will suffer no meaningful criminal consequences for their
> cowardly attacks, is a disgrace on the part of the DA's office and
> the city of San Francisco, and an insult to the brave SFPD officers
> who arrested the Tanners in an effort to keep people like me safe.
>
> Although I was extraordinarily lucky not to have been seriously
> injured or killed, the attack has left me with a profound and lasting
> feeling of fear, anxiety, helplessness, and hopelessness.  For 20
> months since the attack, I have not slept soundly even a single
> night and live with constant anxiety.  I rarely leave the house.  And
> my relationships with my family and friends have been
> impacted as well.

60.     Mr. Lê also explained that:

- He was not provided with notice and did not receive an opportunity to confer with the
  prosecutor before the Defendant received a lenient pre-trial plea agreement;

- He was not given the opportunity to be heard at the sentencing of his attacker;

- He was not consulted before a Protective Order was sought as part of the Defendant's
  sentence and therefore, unfortunately, the Protective Order included erroneous
  information and arguably was ineffective.

The judge, the Honorable Teresa Caffese, told Mr. Lê:  "***The DA's office should have***

***notified you because that's the law.  That's Marsy's Law.***"  Ex. A at 5:16-17 (emphasis added).

Further, when Mr. Lê stated that he believed that the specific failure by the DA's office to "let

him know they were considering a plea agreement . . . is a violation of Marsy's Law," the Court

13

1 | responded: "You're right about that." *Id.* at 12:12-24.

2 |     61.     Indeed, the DA's failures detailed by Mr. Lê are a clear violation of Marsy's Law,

3 | approved by California voters as Proposition 9, the Victims' Bill of Rights Act of 2008, and

4 | enshrined in the California Constitution, article I, § 28(b).

5 |     62.     Sadly, after being treated as less than a person by the Tanner family, the DA's

6 | office continued to mistreat Mr. Lê rather than treating him "as a respected, participating

7 | citizen." *In re Vicks*, 56 Cal. 4th at 310.

8 |     63.     As the hearing wound to a close, Ms. Ta made the following request:

9 |
10 |
11 |
12 |
> This is probably a very ministerial matter.  We have a copy of the
> protective order, and it just says Anh L., male, 67.  For purposes of
> his dignity and actually his protection, he respectfully asks the
> Court to have his full name there so that he can hang onto this
> protective order because it's very important to him and his
> safety . . . .

13 | Ex. A at 8:12-17.

14 |     64.     Ms. Ta noted that she would attempt to work with the DA's office to remedy the

15 | issue and the hearing moved on, though not before Mr. Lê once again spoke in depth about the

16 | importance to him of a corrected Protective Order.

17 |     65.     However, when Ms. Ta followed up with the DA's office, she received no

18 | assistance in correcting the Protective Order.

19 |     66.     Left with no other choice, Mr. Lê filed his own motion for a corrected Protective

20 | Order.

21 |     67.     Finally, on October 5, 2021, Mr. Lê's motion for a corrected Protective Order was

22 | heard.  A true and correct transcript of that hearing is attached here as **Exhibit C**.

23 |     68.     The Assistant DA present that day told Ms. Ta the motion could not proceed

24 | because the Defendant was not present to be served, even though the Deputy Public Defender

25 | represented that he could accept service on behalf of Jimmy Tanner.  Ms. Ta then insisted that

26 | she be able to speak to the Court.

27 |
28 |

14

69.     When the parties came before the presiding judge, the Honorable Alexandra

Robert Gordon, Judge Gordon quickly agreed to sign the corrected Protective Order:

> Let's put an end to that and fix it right now.  I'm sorry that you're
> required to actually step take this additional step as really anyone can
> terminate an incorrect protective order and sign a new one.
> I know I've done it for other people. So it certainly can
> be done.  And I apologize for the inconvenience, and I'm sure it
> must be very upsetting, because it requires people to relive
> incidents every time they have to come to court and ask for
> something I'm sure.

Ex. C at 4:15-24.

70.     Even after the CPO was finally corrected, given Jimmy Tanner's short probation-

only sentence, the Protective Order will expire in April 2022 when Jimmy Tanner's single year

of probation is complete.

71.     After hearing Mr. Lê's story, Judge Gordon acknowledged that Mr. Lê had "been

made to feel invisible . . . like you don't exist and what you want doesn't matter.  And that is a

terrible, terrible, terrible way to feel." *Id.* at 12:19-21.

72.     Judge Gordon then stated ". . . of course you, as a victim, have constitutional

rights under Marsy's Law, and you know what they are . . . .  And you have a right to be

consulted, and you have the right to be here." *Id.* at 12:27-13:3.

73.     Judge Gordon explained that she herself had presided over Jimmy Tanner's

sentencing.  While Judge Gordon stated ADA Lopez had told her at sentencing that Mr. Lê

would be absolutely opposed to the plea,[8] Judge Gordon acknowledged she had not had a chance

to hear from Mr. Lê himself before accepting the plea.  *Id.* at 13:13-21.

74.     Judge Gordon then emphasized that although the plea cannot be undone, she was

sorry for Mr. Lê's experience with the criminal justice system:

> Mr. Tanner has pled, and maybe that was a good resolution, or
> maybe it was terrible, maybe it is the travesty that you say, maybe
> it's somewhere in between.  It's certainly a travesty to you because

---

[8] Mr. Lê was not, in fact, consulted, which he made clear stating, "the proposed resolution was
never presented to me." *Id.* at 17:3.  Judge Gordon responded, "Okay.  I'm really sorry for that."
*Id.* at 17:4.

of what you experienced.  I'm not going to try to talk you out of
that.  I think you're right.

I think like most things in here, many things can be true
for each of us at the same time. And what is true for you -- so what
is true is this is a travesty.  It is done. We cannot unwind it.  I can
only apologize to you for the experience that you have had in this
building, and for any part that the Court has played in it.  I am
absolutely sorry.

We are here to serve, and I know that all of us take that duty
extremely seriously.  And it seems that we have failed you in our
service, and that is absolutely not okay.

So I do want to offer my apology to you for that, because I
am of that failure.  And you deserve to feel absolutely
100 percent differently than you do about the resolution of this
matter.

*Id.* at 14:5-24.

### D.  THE WAVE OF VIOLENCE AND THE DISTRICT ATTORNEY'S FAILURE TO PROTECT ASIAN AMERICANS ECHOES CALIFORNIA AND SAN FRANCISCO HISTORY.

75.     Mr. Lê's experience is by no means singular.

76.     There is a long and pernicious history of discrimination, bigotry, and violence
against Asian Americans in California and San Francisco.[9]

---

[9] Chinese immigrants who arrived during the California Gold Rush in the nineteenth century soon faced violence and hatred.  As the United States Supreme Court described this history in 1889, while upholding the Chinese Exclusion Act:  competition between Chinese Immigrant laborers and what the Supreme Court described as "our people" led to "irritation, proportionately deep and bitter, [] followed, in many cases, by open conflicts, to the great disturbance of the public peace." *Chae Chan Ping v. United States*, 130 U.S. 581, 594-95 (1889).  In 1867, a mob of white laborers drove Chinese laborers from their San Francisco worksite, injuring 12 and killing one.  Kevin Waite, "*The Blood History of anti-Asian violence in the West*," National Geographic (May 10, 2021), available at: [https://www.nationalgeographic.com/history/article/the-bloody-history-of-anti-asian-violence-in-the-west].  After the Civil War, organized campaigns against Chinese immigrants included the founding of anti-coolie clubs, which advocated for bans on Chinese immigration and even defended white vigilantes who committed violent acts against Chinese laborers.  *Id.*  Historians have documented more than a dozen attacks on Chinese workers in California that were attributed to the Ku Klux Klan between 1868 and 1870.  Kevin Waite, "*The Forgotten History of the Western Klan*," The Atlantic (April 6, 2021), available at: [https://www.theatlantic.com/ideas/archive/2021/04/california-klans-anti-asian-crusade/618513/].

77.     There is an equally long and troubling history of failure by California's government and legal system to protect Asian Americans from popular violence.[10]

78.     The history of California also includes many examples of Asian Americans being scapegoated for outbreaks of epidemic disease.[11]

---

[10] In *People v. Hall*, 4 Cal. 399 (1854), the California Supreme Court overturned the conviction of a white man for the murder of a Chinese man, because that conviction was based on the testimony of Chinese witnesses.  The California Supreme Court found "Chinamen," along with African Americans and Native Americans, were incompetent to testify in California's courts.  *See* Gabriel J. Chin, *"A Chinaman's Chance" in Court: Asian Pacific Americans and Racial Rules of Evidence*, 3 U.C. Irvine L. Rev. 965 (2013), available at: [https://scholarship.law.uci.edu/ucilr/vol3/iss4/8].  In 1870, the California Supreme Court affirmed the exclusion of testimony by Chinese Americans and rejected the argument that such a ban violated the then recently enacted Fourteenth Amendment, which California lawmakers had campaigned against on the ground it would grant civil rights to Chinese immigrants, and which California had rejected—the only free state to do so.  *See People v. Brady*, 40 Cal. 198 (1870).  Waite, "*The Blood History of anti-Asian violence in the West*," *supra* n.9.  As the California Supreme Court recognized approximately a century and a half later, "[h]ostility toward Chinese labor, together with cultural tensions and xenophobia, prompted the California Legislature to enact a raft of laws designed to disadvantage Chinese immigrants.  Many of the era's discriminatory laws and government actions were upheld by this court."  *In re Chang*, 60 Cal. 4th 1169, 1172 (2015) (internal citations omitted).  California's Chief Justice recognized the ban on testimony by Chinese witnesses, and the resulting impunity for those who committed crimes against persons of Chinese descent, encouraged targeting of that community.  *People v. Jones*, 31 Cal. 565, 573 (1867) ("In the nature of things, it would seem, that the very fact of the existence in our midst of a large class of people, upon whom crimes can be committed without fear of detection or conviction, and, therefore, with impunity, must tend to encourage the commission of crimes upon that class . . . .").  Indeed, "at this time assaults on Chinese people in California generally went unpunished."  Waite, "*The Blood History of anti-Asian violence in the West*," *supra* n.9.

[11] When San Francisco faced a smallpox outbreak in 1875, for example, officials blamed the "foul and disgusting vapors" and "unwholesome" living conditions of Chinatown.  Even through the epidemic continued after the city-ordered fumigation of all the homes in Chinatown, the blame persisted.  Joan B. Trauner, "*Chinese as Medical Scapegoats, 1870-1905*," California Historical Magazine (1978), available at: [https://www.foundsf.org/index.php?title=Chinese_as_Medical_Scapegoats,_1870-1905].  City health office J.L. Meares wrote at the time:  "I unhesitatingly declare my belief that the cause is the presence in our midst of 30,000 (as a class) of unscrupulous, lying and treacherous Chinamen, who have disregarded our sanitary laws, concealed, and are concealing their cases of smallpox."  *Id.*  Likewise, when the city encountered cases of the bubonic plague in 1900, San Francisco attempted to quarantine roughly 14,000 Chinese Americans who lived in that part of the city.  City officials even proposed sending Chinese residents to a detention camp, though a circuit court rejected this plan.  *Id.*

79.     Over the past couple of years, again faced with a frightening outbreak of disease, rather than shielding Asian Americans from racial animus, some leaders at the highest levels of government have fostered hatred and inspired acts of violence.

80.     In 2020, as the COVID-19 virus began to ravage the United States, shutting down large sectors of the economy, forcing Americans into their homes, and eventually leading to hundreds of thousands of deaths, then-President of the United States, Donald J. Trump repeatedly called the virus the "Chinese flu," "China flu," "China virus," "Wuhan virus," and "kung flu" at political rallies, to laughter and cheers.[12]

81.     As of March of 2021, the organization STOP AAPI Hate reported over 700 incidents explicitly correlated with "comments that were made about China, as the 'China virus,' the 'Wuhan virus,' and 'kung flu,' and similar comments that were made about sending people back to their country."[13]

82.     A Pew survey released in April, 2021 found that 32 percent of Asian American adults said they feared during the pandemic that someone would threaten or physically attack them because of their race or ethnicity—far higher than any other group.[14]

83.     In a particularly deadly incident, on March 16, 2021 in the Atlanta, Georgia area, a 21-year-old shot and killed eight people, six of whom were Asian women.[15]

---

[12] Colby Itkowitz, "*Trump again uses racially insensitive term to describe coronavirus*," The Washington Post (June 23, 2020), available at: [https://www.washingtonpost.com/politics/trump-again-uses-kung-flu-to-describe-coronavirus/2020/06/23/0ab5a8d8-b5a9-11ea-aca5-ebb63d27e1ff_story.html].

[13] Katherine Fung, "*30% of Anti-Asian Incidents in 2020 Used Rhetoric Like 'China Virus,' 'Kung Flu,' Report Says*," Newsweek (March 18, 2021), available at: [https://www.newsweek.com/30-anti-asian-incidents-2020-used-rhetoric-like-china-virus-kung-flu-report-says-1577189].

[14] Neil G. Ruiz, Khadijah Edwards, and Mark Hugo Lopez, "One-third of Asian Americans fear threats, physical attacks and most say violence against them is rising," Pew Research Center (Apr. 21, 2021), available at [https://www.pewresearch.org/fact-tank/2021/04/21/one-third-of-asian-americans-fear-threats-physical-attacks-and-most-say-violence-against-them-is-rising/].

[15] Jaclyn Diaz and Vanessa Romo, "*8 People, Many Of Them Asian, Shot Dead At Atlanta-Area Spas; Man Arrested*," NPR (Mar. 17, 2021), available at: [https://www.npr.org/2021/03/16/978024380/8-women-shot-to-death-at-atlanta-massage-parlors-

E.   **SAN FRANCISCO BECOMES AN EPICENTER OF ANTI-ASIAN VIOLENCE, AND THE DA'S OFFICE SYSTEMATICALLY MISHANDLES CASES ARISING FROM THIS VIOLENCE AND DEPRIVES VICTIMS OF THEIR RIGHTS.**

84.   The Atlanta shootings, which drew national attention, occurred at a crescendo of surging violence against Asian Americans in San Francisco.

85.   On information and belief, the San Francisco DA's office responded similarly to a number of these attacks on Asian Americans—i.e., in the same deeply-flawed manner as they handled the attack on Mr. Lê.

86.   A few weeks before the Atlanta shootings, 84-year-old Rong Xin Liao was leaning on his walker at a bus stop in the Tenderloin neighborhood of San Francisco when suddenly a young man leapt through the air and kicked him, causing him to fall to the ground and forcefully strike his head on the sidewalk.  Mr. Liao was injured and hospitalized for four days following the attack.[16]  The attack on Mr. Liao was highly-publicized, perhaps in part because the attack was captured on video.[17]

87.   In the criminal case against Mr. Liao's attacker, Mr. Liao's attorney filed papers objecting to both the lenient resolution and potential violations of Marsy's Law by the DA's office.[18]  Mr. Liao's "Ex Parte Application Seeking An Order to Preserve Victim's Rights, Pursuant to Cal. Constitution, Art. I, Section 28" and attorney declaration in support of the application are attached here as **Exhibit D**.

88.   According to the pleadings filed by Mr. Liao, the attack fractured Mr. Liao's skull and broke Mr. Liao's collarbone.  Mr. Liao remains emotionally traumatized, fearful he will be

---

man-arrested].

[16] Daniel Zoellner, "*Asian man speaks out after he's brutally attacked while waiting for bus in San Francisco*," The Independent (March 26, 2021), available at: [https://www.independent.co.uk/news/world/americas/asian-attack-san-francisco-hate-crime-b1823163.html].

[17] *See* Dion Lim, "*84-year old Asian man warns others year after brutal San Francisco attack*," acb7News (March 26, 2021), available at: [https://abc7news.com/san-francisco-asian-attack-sf-stop-hate-aapi/10449226/].

[18] *See People of California v. Eric Ramos-Hernandez*, San Francisco Superior Court Case No. 20002697.

attacked again, and is afraid to go outside.  "Given the spate of violent attacks on the Asian communities, Mr. Liao is worried that the District Attorney's apparent reluctance to prosecute will only encourage further violence that continues to threaten the security of him and others." Ex. D at 4.

89.     Mr. Liao was further traumatized when he learned for the first time that his assailant may never be prosecuted because the defendant had been granted the benefit of pre-trial diversion, which it appears the District Attorney did not oppose.  *Id.*

90.     His public filings explain that neither Mr. Liao nor his family had been informed that the DA's office would not be prosecuting the defendant in his case, subject to pre-trial diversion.  Nor was he ever informed of his right to be heard at a proceeding regarding the post-arrest release of the defendant.  Had he been informed, Mr. Liao explained that he would have asserted his right to be heard at the hearing when the defendant's application for diversion was considered.  Based on a statement made to a family member of Mr. Liao, Mr. Liao also expressed concern that his belief regarding the need for full prosecution of his attacker was misrepresented to the court by the DA's office at the time when the court decided to allow pre-trial diversion.  *Id.*

91.     Even aided by counsel, Mr. Liao struggled to get the DA's office to provide him with publicly-filed documents in his case, with the DA's office making various excuses, including that it could not provide such publicly available documents without Mr. Liao first signing a release.  *Id.* at 5.  This refusal to assist victims and their counsel is similar to what Mr. Lê experienced when he and his counsel sought to have the Criminal Protective Order corrected in his case.  Simple, ministerial requests go unanswered, or the DA's office seeks to put victims and their lawyers through a gauntlet of unnecessary and time-consuming bureaucratic barriers.

92.     Similar to Mr. Lê's case, Mr. Liao has alleged that the DA's office failed to observe Marsy's Law:  "Based upon Mr. Liao's description of how this case has been handled, it appears that his rights under Marsy's Law, Cal. Const., Art. I, § 28, were not protected by the DA's office."  *Id.*

93.     In another case, a 19-year-old man was charged with shoving to the ground 84-

20

year-old Vicha Ratanapakdee, a Thai man, in a daylight attack in the Anza Vista neighborhood of San Francisco.  Mr. Ratanapakdee unfortunately did not survive the attack.  His daughter, Monthanus and her husband, Eric, spoke to DA Boudin on February 4, 2021, and later spoke of how they were treated callously and how their concerns went unheeded.  As they told the New York Times Magazine:

> We were like, 'Is this a hate crime?' He was like, 'I can't talk about this'. . . . It was just the way that he answered the question that made me feel like he didn't really care about our emotions, about what we were asking about.

Jaeah Lee, "*Why Was Vicha Ratanapakdee Killed?*" The New York Times Magazine (August 17, 2021), available at: [https://www.nytimes.com/2021/08/17/magazine/vicha-ratanapakdee.html].

94.    DA Boudin told the New York Times that he believed the attack wasn't racially motivated and that Ratanapakdee's accused killer was having "some sort of temper tantrum." Ratanapakadee's son-in-law responded, "I don't buy it for a second, I don't buy it for a second. He knew what he was doing. Hearing this excuse of a hissy fit is really upsetting."[19]

95.    On information and belief, the Ratanapakdee family's requests for help and resources have gone answered.  On information and belief, the Ratanapakdee family made requests for a Thai interpreter, who could explain their rights and the criminal justice process. For weeks, they were told that the DA's office lacked the resources to make such an interpreter available.

96.    Although Defendant Boudin held a press conference to denounce the violence against the Asian American community, and stated that he had personally met with victims' families such as the Ratanapakdees, Mr. Ratanapakdee's son-in-law told reporters that he had only heard from Boudin once, via Zoom, and that while Boudin planned to attend a vigil held for his father in-law, when the Ratanapakdees conveyed they did not want to take photos or videos

---

[19] Dion Lim,  "*Family outraged over SF DA's description of 84-year-old Asian man's suspected killer*,"  ABC7 San Francisco (March 2, 2021), available at:  [https://abc7news.com/san-francisco-da-chesa-boudin-sf-district-attorney-84-year-old-man-killed/10381125/].

1   with the DA during the vigil, Boudin did not show up.[20]

2       97.    Case after case, where an Asian American individual is attacked or killed in San

3   Francisco, the DA and his office failed to follow the law by failing to properly informing victims

4   of their rights during sentencing or a plea deal in violation of Marsy's Law.  To compound the

5   profound pain, humiliation and suffering of these victims, the San Francisco District Attorney

6   and his office failed to provide adequate training such that victims are ignored, poorly treated, or

7   cast aside, and left to navigate on their own a system that is supposed to protect them and

8   provide them with the opportunity to be heard in criminal proceedings.

9   **F.    PUBLICLY AVAILABLE INFORMATION SHOWS THE INADEQUACY OF THE**
   **DA'S APPROACH TO THE ATTACKS ON ASIAN AMERICAN VICTIMS.**
10

11       98.    The DA's office currently has a video entitled "Combating Hate Crimes" on its

12   website but only makes the video available in English, Spanish, and Cantonese, not the many

13   other languages spoken within the Asian American community of San Francisco.[21]

14       99.    Above this 30 second video, the website states:

15           There is no place for hate in San Francisco. We are committed to
   combatting hate crimes against all targeted communities in San
16           Francisco, including the AAPI community. Our efforts include
   prevention, partnership with law enforcement, and holding those
17           who commit these crimes accountable through prosecution.

18

19       However, neither this portion of the website nor the video describes any specific response

20   to the surge of violence against Asian Americans.

21       100.    The DA's website also includes a 2020 End of Year Report which discusses a

22   variety of topics, but nowhere mentions training concerning Marsy's Law or implicit bias, or any

23   other form of specialized training conducted so prosecutors are educated regarding the rights of

24   victims and the importance of ensuring equal access to justice for traditionally underserved and

25

26   [20] Dion Lim,  *"ABC7 presses SF DA about what's being done on crimes against Asian
   Americans,"* ABC7 San Francisco (March 12, 2021), available at: [https://abc7news.com/attacks-
27   against-asian-americans-dion-lim-chesa-boudin-sf-district-attorney/10408676/].

28   [21] https://www.sfdistrictattorney.org/victim-services/hate-crime/.

underprotected communities now being targeted.[22]

101.    Under "Victim's Rights" on its website, the DA's office acknowledges the rights enumerated within Marsy's Law, but similarly fails to list any such policies, procedures, or training to ensure that they are observed.[23]

102.    Further, the DA's office has also reportedly failed to provide the public with adequate information regarding the scope of hate crimes against Asian Americans in San Francisco.  "San Francisco reported nine hate crime cases filed in 2020 and at least six in 2021. Though race was a suspected motive in 11 of the cases, information provided by the DA's office did not state why a victim was targeted."[24]  This lack of transparency reflects the DA's office's failure to prioritize a response to the horrendous attacks on Asian Americans that have occurred in the last few years.

**G.  IMPLICIT BIAS, UNCHECKED BY PROPER TRAINING AND PROCEDURES, HAS LED TO THE SYSTEMATIC DISENFRANCHISEMENT OF ASIAN AMERICAN CRIME VICTIMS IN SAN FRANCISCO BY THE DA.**

103.    The failings of the DA's office in Mr. Lê's case and others are the direct result of the absence of an affirmative and effective policy response, including training and procedures emphasizing the importance of: vigorously investigating and prosecuting potential hate crimes against Asian Americans, upholding the due process rights of victims, and providing culturally sensitive and timely in-language communication with Asian American victims.

104.    Such training and procedures are necessary to avoid discriminatory application of the law as a result of implicit bias.

105.    On information and belief, in the absence of such training and procedures, Asian Americans have been subjected to unequal treatment by the DA's office.

---

22 *See* https://sfdistrictattorney.org/wp-content/uploads/2021/04/4.19.21-Victim-Impact-Survey-Report.pdf.

23 *See* https://www.sfdistrictattorney.org/victim-services/victims-rights/.

24 Robert Salonga,  "*As laws tackle anti-Asian attacks, advocates push focus to the hate behind the crime,*"  San Jose Mercury News (June 13, 2021), available at: [https://www.mercurynews.com/2021/06/13/as-laws-tackle-anti-asian-attacks-advocates-readjust-focus-to-hate-over-crime/].

106.     Further, while Asian Americans are often lumped together as a monolithic group and stereotyped as a "model minority," the reality in the United States and San Francisco is that many Asian Americans remain underserved and marginalized, and therefore are particularly vulnerable to institutional implicit bias.[25]

107.     A closer look at San Francisco's two dozen Asian ethnicities reveals many groups within this broad categorization are struggling financially and remain outside the mainstream. About 43% are non-English speakers, according to a USA TODAY analysis of U.S. census data. About a third of San Franciscans are foreign-born, and 13% are not U.S. citizens.[26]

108.     In California, about 5 million of 40 million state residents are Asian American, and in three-quarters of those homes, languages other than English are spoken regularly, according to the U.S. census.[27]  In San Francisco City and County, an even larger percentage of residents are Asian American with 36.5% of residents identified as Asian or Native Hawaiian and Other Pacific Islander.[28]

109.     Asian American communities in San Francisco speak a range of languages including Mandarin, Cantonese, Japanese, Korean, Tagalog, Laotian, Samoan, Tongan, Vietnamese, Urdu, and Hindi.[29]

110.     "Asian Americans in San Francisco are often left behind by city partnerships aimed at helping vulnerable populations."[30]

111.     As is increasingly being recognized, underpolicing—the failure by law

---

[25] Marco della Cava, "*Asian Americans in San Francisco are dying at alarming rates from COVID-19:  Racism is to blame*," USA TODAY (October 18, 2020), available at [https://www.usatoday.com/in-depth/news/nation/2020/10/18/coronavirus-asian-americans-racism-death-rates-san-francisco/5799617002/].

[26] *Id.*

[27] *Id.*

[28] *See* https://www.census.gov/quickfacts/fact/table/sanfranciscocountycalifornia.

[29] *Id.*

[30] Marco della Cava, "*Asian Americans in San Francisco are dying at alarming rates*," *supra* n.25.

enforcement to devote sufficient attention and resources to protecting marginalized communities—"expressively devalues the lives of people of color, destabilizes families, erodes communities, and causes deep psychic harms."[31]  The same is true when prosecutorial power is applied in an unequal manner depending upon immutable characteristics of the victim, such as race and national origin.

112.    In the absence of judicial intervention with regard to the San Francisco District Attorney's Office, such failures and deprivations of the constitutional rights of Asian Americans like Mr. Lê are likely to continue.

### FIRST CAUSE OF ACTION

**VIOLATION OF FOURTEENTH AMENDMENT—EQUAL PROTECTION**
**(AGAINST DEFENDANT BOUDIN, IN HIS OFFICIAL CAPACITY, FOR**
**DECLARATORY AND INJUNCTIVE RELIEF)**

113.    Paragraphs 1-112 are incorporated by reference as if set forth fully herein.

114.    The Equal Protection Clause of the Fourteenth Amendment prohibits states from denying any person the equal protection of the laws.  *See* U.S. Const. amend. XIV, § 1.

115.    Under the Equal Protection Clause if a law or regulation burdens a fundamental right to some groups but not others, the law or regulation can be upheld only if the government can justify it under strict scrutiny.  *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973).  To survive strict scrutiny, the government must demonstrate that the law or regulation is "'narrowly tailored' to serve a 'compelling' government interest."  *See e.g., Parents Involved in Cmty. Schs. v. Seattle Sch. Dist.*, 551 U.S. 701, 720 (2007) (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995)).

116.    As described hereinabove, the DA's office has applied policies and procedures and the law of California in a manner that has produced discriminatory effects on Asian Americans because of their race and national origin, and which demonstrates discriminatory intent against that community.

---

[31] Sarah L. Swan, "*Discriminatory Dualism*," 54 Ga. L. Rev. 869, 877–79 (2020).

117.    In addition, Marsy's Law provides basic rights for all crime victims in California. Cal. Const., art. I, § 28.  On information and belief, the DA's office has failed to provide the due process guaranteed to victims under the California Constitution to Asian American victims of violent crimes, including failing to inform and consult these victims at critical stages and failing to allow them opportunities to be heard by courts.

118.    Given the frequency of attacks on Asian Americans in San Francisco, Plaintiff reasonably fears that he is likely to be attacked again, and that his rights will be further violated by the DA's office.

119.    Further, Marsy's Law requires various post-conviction procedures and Plaintiff reasonably believes, given the DA's office's past failures, that his Marsy's Law rights will continue to be violated in any future interactions with the DA's office.

120.    On information and belief, due to a lack of appropriate training, procedures, and dedication of resources by the DA's office, Asian American victims of violence, many of whom speak English as a second language, are immigrants with limited education, limited English skills, and limited understanding of the criminal justice system, have faced systemic bias and unequal treatment by that office.  Plaintiff is accordingly entitled to a judgment declaring that the DA's office's policies and procedures violate the Equal Protection Clause.

121.    Under *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny, suits against officials, who are violating, or planning to violate, federal law or the United States Constitution may proceed in equity.  The *Ex Parte Young* doctrine empowers federal courts to enjoin otherwise immune officials from violating federal law but requires that the individual government official responsible (in this case Mr. Boudin) be named as a defendant.

122.    "Actions under *Ex parte Young* can be brought against both state and county officials."  *Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018).

123.    Plaintiff is accordingly entitled to an injunction requiring the DA's office or any of its employees, or agents to institute non-discriminatory policies and procedures, because their current policies and procedures violate the Equal Protection Clause.  *Swann v. Charlotte-Mecklenburg Bd. Of Ed.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown,

26

the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

## SECOND CAUSE OF ACTION

### VIOLATION OF FOURTEENTH AMENDMENT—DUE PROCESS OF LAW (AGAINST DEFENDANT BOUDIN, IN HIS OFFICIAL CAPACITY, FOR DECLARATORY AND INJUNCTIVE RELIEF)

124.   Paragraphs 1-123 are incorporated by reference as if set forth fully herein.

125.   The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits states from depriving any person of life, liberty, or property, without due process of law.  *See* U.S. Const. amend. XIV, § 1.

126.   The Due Process Clause has both procedural and substantive components, which function to safeguard fundamental liberty interests like the right of access to the courts, and also mandate that certain procedures be followed before the government deprives someone of such an interest.  *See Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997) ("The Due Process Clause guarantees more than fair process . . . [it] also provides heightened protection against government interference with certain fundamental rights and liberty interests.")

127.   California's Constitution protects fundamental liberty interests of crime victims by guaranteeing victims certain enumerated *procedural* and *substantive* rights.  *In re Vicks*, 56 Cal. 4th at 310.

128.   In the provision known as Marsy's Law, the California Constitution, "find[s] and declare[s]" that:

> Victims of crime are entitled to have the criminal justice system view criminal acts as serious threats to the safety and welfare of the people of California. The enactment of comprehensive provisions and laws ensuring a bill of rights for victims of crime, including safeguards in the criminal justice system fully protecting those rights and ensuring that crime victims are treated with respect and dignity, is a matter of high public importance. California's victims of crime are largely dependent upon the proper functioning of government, upon the criminal justice system and upon the expeditious enforcement of the rights of victims of crime described herein, in order to protect the public

1
safety and to secure justice . . . . [¶] The rights of victims pervade
the criminal justice system . . . .

2
Cal. Const., art. I, § 28(a)(2)-(3).

3
129.   Marsy's Law also states:

4
Victims of crime have a collectively shared right to expect that

5
persons convicted of committing criminal acts are sufficiently
punished in both the manner and the length of the sentences
imposed by the courts of the State of California . . . . To

6
accomplish the goals it is necessary that the laws of California

7
relating to the criminal justice process be amended in order to
protect the legitimate rights of victims of crime.

8
Cal. Const., art. I, § 28(a)(5)-(6), (8).

9
130.   Marsy's Law includes the following enumerated rights:

10
- To be treated with fairness and respect for his or her privacy and dignity, and to be

11
free from intimidation, harassment, and abuse, throughout the criminal or juvenile
justice process.

12
- To be reasonably protected from the defendant and persons acting on behalf of the

13
defendant.

14
- To have the safety of the victim and the victim's family considered in fixing the
amount of bail and release conditions for the defendant.

15
- To reasonable notice of and to reasonably confer with the prosecuting agency, upon

16
request, regarding, the arrest of the defendant if known by the prosecutor, the charges
filed, the determination whether to extradite the defendant, and, upon request, to be

17
notified of and informed before any pretrial disposition of the case.

18
- To reasonable notice of all public proceedings, including delinquency proceedings,
upon request, at which the defendant and the prosecutor are entitled to be present and

19
of all parole or other post-conviction release proceedings, and to be present at all such
proceedings.

20
- To be heard, upon request, at any proceeding, including any delinquency proceeding,

21
involving a post-arrest release decision, plea, sentencing, post-conviction release
decision, or any proceeding in which a right of the victim is at issue.

22
- To provide information to a probation department official conducting a pre-sentence

23
investigation concerning the impact of the offense on the victim and the victim's
family and any sentencing recommendations before the sentencing of the defendant.

24
- To receive, upon request, the pre-sentence report when available to the defendant,

25
except for those portions made confidential by law.

26
- To be informed, upon request, of the conviction, sentence, place and time of

27
incarceration, or other disposition of the defendant, the scheduled release date of the
defendant, and the release of or the escape by the defendant from custody.

28

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

- To have the safety of the victim, the victim's family, and the general public considered before any parole or other post-judgment release decision is made.

2

- To be informed of the rights enumerated [under Marsy's Law].

3   Cal. Const., art. I, § 28(b).

4       131.    Defendants' policies, practices, customs, supervision, and training as they pertain

5   to victims' rights have denied and continue to deny adequate *procedural* and *substantive* due

6   process protections to Plaintiff.

7       132.    Under the *substantive* due process component of the Fourteenth Amendment, if a

8   law or regulation burdens a fundamental liberty interest, the law or regulation can be upheld only

9   if the government can justify it under strict scrutiny.  *See Glucksberg*, 521 U.S. at 721.  To

10  survive strict scrutiny, the government must demonstrate that the law or regulation is "narrowly

11  tailored to serve a compelling [government] interest."  *Id.*

12      133.    By depriving victims like Plaintiff of their right to be heard and participate in the

13  judicial process, Defendants' policies and procedures infringe the fundamental liberty interest of

14  victims to petition the government for redress of grievances, in violation of substantive due

15  process.  *See Ringgold-Lockhart v. Cnty. Of Los Angeles*, 761 F.3d 1057, 1061 (9th Cir. 2014)

16  ("[T]he right of access to the courts is a fundamental right protected by the Constitution."); *see*

17  *also BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 524– 25 (2002) (describing right to petition

18  as "one of the most precious of the liberties safeguarded by the Bill of Rights").

19      134.    *Procedural* due process requires that the government be constrained before it acts

20  in a way that deprives a person of liberty interests protected under the Due Process Clause of the

21  Fourteenth Amendment.  *See Matthews v. Eldridge*, 424 U.S. 319, 332 (1976).

22      135.    A procedural due process claim requires: "(1) a protect[ed] liberty or property

23  interest . . . and (2) a denial of adequate procedural protections."  *Foss v. Nat'l Marine Fisheries*

24  *Serv.*, 161 F.3d 584, 588 (9th Cir. 1998).

25      136.    In violation of his right to procedural due process, Plaintiff was not provided with

26  notice or an opportunity to be heard before being deprived of his rights by the DA's office.

27  *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950).

28

137.    On information and belief, the DA's office has repeatedly violated the due process rights of other Asian American victims guaranteed by the California Constitution under Marsy's Law and continues to do so in the absence of adequate policies and procedures.

138.    The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes this Court to declare the rights of interested parties in a case of actual controversy within the Court's jurisdiction.

139.    A real and actual controversy has developed between Plaintiff Anh Lê and the District Attorney concerning whether the DA's office violated Marsy's Law and his fundamental due process rights.

140.     Plaintiff is accordingly entitled to a judgment declaring that the DA's office has violated the Due Process Clause of the Fourteenth Amendment.

141.    Under *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny, suits against officials who are violating, or planning to violate, federal law or the United States Constitution may proceed in equity.  The *Ex Parte Young* doctrine empowers federal courts to enjoin otherwise immune officials from violating federal law but requires that the individual government official responsible (in this case Mr. Boudin) be named as a defendant.

142.    "Actions under *Ex Parte Young* can be brought against both state and county officials."  *Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018).

143.    Given the frequency of attacks on Asian Americans in San Francisco, Plaintiff reasonably fears that he is likely to be attacked again, and that his rights will be further violated by the DA's office.

144.    Further, Marsy's Law requires various post-conviction procedures and Plaintiff reasonably believes, given the DA's office's repeated past failures, that his Marsy's Law rights will continue to be violated in any future interactions with the DA's office.

145.    Plaintiff is accordingly entitled to an injunction requiring the DA's office or any of its employees, or agents to comply fully with Marsy's Law in all cases and to institute appropriate training, policies, and procedures to facilitate such compliance.

# THIRD CAUSE OF ACTION

## (*Monell*: 42 U.S.C. § 1983; AGAINST THE CITY AND COUNTY OF SAN FRANCISCO FOR DECLARATORY AND INJUNCTIVE RELIEF)

146. Paragraphs 1-145 are incorporated by reference as if set forth fully herein.

147. "Pursuant to 42 U.S.C. § 1983, a local government may be liable for constitutional torts committed by its officials according to municipal policy, practice, or custom." *Weiner v. San Diego Cnty.*, 210 F.3d 1025, 1028 (9th Cir. 2000) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)).

148. "To hold a local government liable for an official's conduct, a plaintiff must first establish that the official (1) had final policymaking authority concerning the action . . . at issue and (2) was the policymaker for the local governing body for the purposes of the particular act." *Id.* at 1028 (citing *McMillian v. Monroe Cnty.*, 520 U.S. 781, 785 (1997)).

149. The Ninth Circuit has held that a District Attorney is a policymaker for the local government in the jurisdiction they serve when the conduct at issue concerns "administrative oversight of systems used to help prosecutors comply with their constitutional duties" and therefore in such instances "a cause of action may lie against the County under 42 U.S.C. § 1983." *Goldstein v. City of Long Beach*, 715 F.3d 750, 762 (9th Cir. 2013).

150. As the Ninth Circuit noted in *Goldstein*, by California law:

- DAs are paid "out of the county treasury," Cal. Gov't Code § 28000;
- the county board of supervisors "shall prescribe the compensation" of the district attorney, Cal. Gov't Code § 25300'
- necessary expenses incurred "in the prosecution of criminal cases" are "county charges," Cal. Gov't Code § 29601;
- a DA must "account for all money received by him in his official capacity and pay it over to the treasurer" of the county board of supervisors; and,
- counties are required to defend and indemnify the district attorney in an action for damages. Cal. Gov't Code §§ 815.2, 825.

715 F.3d at 758.

151. Pursuant to the Consolidation Act of 1856, unique within California, the City and County of San Francisco are consolidated entities, with a shared government and coterminous boundaries. The DA serves in his role on behalf of both the city and county. Therefore, the City

31

and County of San Francisco have equal and identical liability for any actions the DA takes as a municipal policymaker.

152.    Municipal liability exists where a municipality, acting through its relevant policymaker, fails to properly train, supervise, and discipline its employees amounting to a deliberate indifference to a person's constitutional rights.  *See City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989).

153.    Plaintiff was deprived by the DA's office of his constitutional rights to equal protection of the law and due process of law under the Fourteenth Amendment.

154.    On information and belief, the deprivation of Plaintiff's rights was part of a continuing, persistent, and widespread custom and practice by the DA's office of failing to comply with Marsy's Law when the victim is Asian American, including with respect to victims Rong Xin Liao and Vicha Ratanapakdee.

155.    On information and belief, the City and County have failed to train their employees within the DA's office to comply with Marsy's Law in a manner that (a) protects the due process rights of Asian American victims, and (b) does not treat similarly situated victims differently on the basis of race and/or national origin.

156.    The City and County's failure to train its employees reflects deliberate indifference to the constitutional rights of Asian American residents.  The City and County know that the DA's office will be faced with the decision to prosecute crimes perpetrated against Asian American victims, know of the history of discrimination against Asian American victims, and know that failing to comply with Marsy's Law with respect to Asian American victims causes a deprivation of those victims' constitutional rights.  The City's failure to train its employees with respect to their obligations under Marsy's Law has continued despite the City's knowledge that the constitutional rights of Asian American victims are being violated.

157.    The City and County's failure to train its employees was the moving force behind, and proximate cause of, the violation of Plaintiff's constitutional rights to equal protection of the law and due process of law under the Fourteenth Amendment.

158.    A real and actual controversy has developed between Plaintiff and Defendants

concerning whether the City and County have a policy that amounts to deliberate indifference to Plaintiff's constitutional rights including his rights to equal protection of the law and due process of law under the Fourteenth Amendment.

159.    Plaintiff is accordingly entitled to a judgment declaring that the City and County's policies and procedures have caused violations of his constitutional rights.

160.   Given the frequency of attacks on Asian Americans in San Francisco, Plaintiff reasonably fears that he is likely to be attacked again, and that his rights will be further violated by the City and County, through the DA's office.

161.   Further, Marsy's Law requires various post-conviction procedures and Plaintiff reasonably believes, given the DA's office's past failures, that his Marsy's Law rights will continue to be violated in any future interactions with the DA's office on behalf of the City and County.

162.    Plaintiff has no adequate remedy at law, and Plaintiff (as an Asian American living in San Francisco) faces ongoing harm and irreparable injury to his constitutional rights unless Defendants are enjoined from continuing their illegal and unconstitutional practices.

163.    Therefore, Plaintiff is entitled to an order requiring the City and County to institute all necessary and appropriate policies, training, and procedures to ensure an end to such unconstitutional practices.

**WHEREFORE**, Plaintiff prays judgment be entered in his favor against Defendant as follows:

1.    For a declaration that the San Francisco DA's office and the City and County of San Francisco violated Mr. Lê's rights under Marsy's Law, in violation of the procedural and substantive due process guarantees of the Fourteenth Amendment to the United States Constitution.

2.    For a declaration that the San Francisco DA's disparate treatment of the cases of violence against Asian Americans violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

3.    For an appropriately tailored injunction, after discovery (if necessary) into the

current practices of the San Francisco DA's office, requiring that DA Boudin, in his official capacity, institute basic constitutionally adequate practices and procedures to comply with Marsy's Law and to ensure that Asian American residents of San Francisco receive equal protection and equal access to justice.  Plaintiff respectfully requests that such injunctive relief include (but not be limited to) the following:

- Language support for victims in Mandarin, Cantonese, Japanese, Korean, Tagalog, Laotian, Samoan, Tongan, Vietnamese, Urdu, and Hindi, including the availability of professional translation at critical stages where Marsy's Law rights are at issue;

- Full translation of sections of the DA's website addressed to victims, into Mandarin, Cantonese, Japanese, Korean, Tagalog, Laotian, Samoan, Tongan, Vietnamese, Urdu, and Hindi;

- Release of complete hate crimes statistics and prosecution/sentencing/plea deal information related to these hate crimes;

- A requirement that the DA's office advise victims explicitly in writing when they have a right to appear at a hearing and that the DA's office confirm with victims the language that will be used to represent their position regarding sentencing, diversion, and other such issues, if a prosecutor makes any such representation on their behalf;

- A requirement that the DA's office advise Asian American hate crime victims that they are allowed to submit a victim impact statement during a defendant's sentencing hearing before the court, and provide language appropriate resources so the victim has the ability to provide such a statement;

- A requirement that the DA's office will cooperate fully with state and federal law enforcement investigations of hate crimes;

- The establishment of a robust referral system where mental health services and other victim's services are provided for Asian American victims of hate crimes;

- A requirement that the DA's office cooperate fully with victims and their lawyers who seek information about their cases and access to public filings;

- Training to ensure personnel in the DA's office understand the importance of accurate

protective orders to ensure victims' safety and mental well-being in the aftermath of violent attacks;

- Training to ensure full consideration of the sentencing goals, identified by California Law for hate crimes offenses:

    (1) Punishment for the hate crimes committed;

    (2) Crime and violence prevention, including prevention of recidivism and prevention of crimes and violence in prisons and jails;

    (3) Restorative justice for the immediate victims of the hate crimes and for the classes of persons terrorized by the hate crimes.

Pen. Code, § 422.86, subd. (a); *see also* Cal. R. Ct., rules 4.427, 4.330.

- Implementation and/or supplementation of implicit bias training[32] to ensure prosecutors understand the impact of unconscious bias relating to victims' characteristics that may affect charging and other critical prosecutorial decisions, and implementation and/or supplementation of cultural competency training to ensure prosecutors understand the factors and dynamics that impact victims' manner of advocating for themselves, and training relating to the history of anti-Asian discrimination in California;

- Ongoing monitoring of the San Francisco DA's office's relevant practices and procedures for however many years necessary, under a consent decree or the equivalent, to ensure practices and procedures compliant with the law and Constitution are implemented and maintained.

///

///

///

---

[32] Such training has been provided by the organization Stop AAPI Hate and has been provided to other District Attorney's offices in California, in many corporations, law firms, and government offices.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1         4.      Such other and further relief as this Court may deem just and proper.

2

DATED:  January 24, 2022

3

4                                             By:    */s/ Quyen L. Ta*

5                                                       Quyen L. Ta

6                                                       K. Luan Tran

                                                   McGregor Scott

7                                                       Michael D. Roth

                                                   James A. Unger

8                                                     KING & SPALDING LLP

9                                                     *Attorneys for Plaintiff, Anh Lê*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF